Mark P. Kindall, Cal. Bar No. 138703
mkindall@ikrlaw.com
Robert A. Izard, *pro hac vice* to be filed
rizard@ikrlaw.com
IZARD KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292

Gregory Y. Porter, *pro hac vice* to be filed
gporter@baileyglasser.com
Mark G. Boyko, *pro hac vice* to be filed
mboyko@baileyglasser.com
Bailey & Glasser LLP
1054 31st Street, NW Suite 230
Washington, DC 20007
Telephone: (202) 463-2101

Joseph A. Creitz, Cal. Bar No. 169552
joe@creitzserebin.com
Lisa S. Serebin, Cal Bar No. 146312
lisa@creitzserebin.com
CREITZ & SEREBIN LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 466-3090

*Attorneys for the Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NELLY F. FERNANDEZ, individually and on behalf of a class of all other persons similarly situated, and on behalf of the Franklin Templeton 401(k) Retirement Plan, | ) ) ) ) | |
| Plaintiffs, | ) | Case Number: 17-cv-06409 |
| v. | ) ) | |
| FRANKLIN RESOURCES, INC., Franklin | ) | |

Templeton 401(k) Retirement Plan )
Investment Committee, Franklin Templeton )
401(k) Retirement Plan Administrative )
Committee, Norman Frisbie, )
Jennifer Johnson, Penelope Alexander, )
Kenneth Lewis, Dan Carr, Nicole )
Smith, Alison Baur, Matthew Gulley, )
The Franklin Resources, Inc. Board of )
Directors, Gregory E. Johnson, Rupert H. )
Johnson, Jr., Charles B. Johnson, Charles )
E. Johnson, Peter K. Barker, Mariann )
Byerwalter, Mark C. Pigott, Chutta )
Ratnathicam, Laura Stein, Seth Waugh, )
Geoffrey Y. Yang, Samuel Armacost, )
Joseph Hardiman, Anne Tatlock, )
And John Doe Defendants 1–10. )
)
                                    Defendants.

## FIRST AMENDED COMPLAINT

1.      Plaintiff Nelly F. Fernandez, individually and as representative of a class of similarly situated persons, ("Plaintiffs") brings this action pursuant to 29 U.S.C. §1132(a)(2) and (3) on behalf of the Franklin Templeton 401(k) Retirement Plan (the "Plan") against Defendants Franklin Resources, Inc. (hereinafter "Franklin Templeton"), Franklin Templeton 401(k) Retirement Plan Administrative Committee ("Administrative Committee"), Franklin Templeton 401(k) Retirement Plan Investment Committee ("Investment Committee"), and individual Investment Committee Members Norman Frisbie, Jennifer Johnson, Penelope Alexander, Kenneth Lewis, Dan Carr, Nicole Smith, Alison Baur, and Matthew Gulley, the Franklin Resources, Inc. Board of Directors, responsible for monitoring the Investment Committee and appointing and removing its members, and members of the Board of Directs, Defendants Gregory E. Johnson, Rupert H. Johnson, Jr., Charles B. Johnson, Charles E. Johnson, Peter K. Barker, Mariann Byerwalter, Mark C. Pigott, Chutta Ratnathicam, Laura Stein, Seth Waugh, Geoffrey Y. Yang, Samuel Armacost, Joseph

Hardiman, Anne Tatlock, and John Doe Defendants 1–10 (collectively "Defendants") for breach of fiduciary duties and state the following as their cause of action.

2. Plaintiff alleges that Defendants breached their fiduciary duties by causing the Plan to invest in funds offered and managed by Franklin Templeton ("Franklin Funds"), when better-performing and lower-cost funds were available. Plaintiff further alleges that Defendants were motivated to cause the Plan to invest in Franklin Funds to benefit Franklin Templeton's investment management business. Plaintiff also alleges that Defendants offered the Plan inferior arrangements compared to that offered to non-captive plans, and, in so doing, engaged in prohibited transactions.

## I. JURISDICTION AND VENUE

3. This court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

4. This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## II. PARTIES

### A. Plaintiff

5. Plaintiff Nelly F. Fernandez is a citizen and resident of Coral Springs, Florida and was a participant in the Plan from at least 2011 through 2016. During the Class Period Plaintiff invested her Plan account in at least four Proprietary Mutual Funds, the Mutual Global Discovery Fund, the Income Fund, the Templeton World Fund, and the Mutual European Fund.

**B.    Defendants**

6.    The Investment Committee consists of at least five members appointed by the Board of Directors of Franklin Templeton. It is responsible for, among other things, analyzing the performance and fees of investment options under the Plan, selecting new investment options to be offered under the Plan, and monitoring and removing or replacing investment options offered under the Plan. Accordingly, it had the fiduciary duty to select, monitor, and remove the Plan's investment options at all times relevant herein. During the Class Period, Norman Frisbie, Jennifer Johnson, Penelope Alexander, Kenneth Lewis, Dan Carr, Nicole Smith, Alison Baur and Matthew Gulley, served as members of the Investment Committee.

7.    The Investment Committee is a fiduciary of the Plan under 29 U.S.C. §1002(21) because it exercised discretionary authority or control respecting the management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or responsibility respecting the administration of the Plan.

8.    The Members of the Investment Committee and any individual or entity to whom the Committee delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiffs, are fiduciaries of the Plan under 29 U.S.C. § 1002(21) because they exercised authority or control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility respecting the administration of the Plan.

9.    The Administrative Committee consists of at least five members appointed by the Board of Directors of Franklin Templeton. It is responsible for, among other things, hiring and firing plan service providers, including the Plan's recordkeeper, maintaining reporting requirements, and interpreting terms of the Plan e.

10.    The Administrative Committee is a fiduciary of the Plan under 29 U.S.C. §1002(21) because it exercised discretionary authority or control respecting the management of the Plan, exercised authority or control respecting management of disposition of the Plan's assets, and/or had discretionary authority or responsibility respecting the administration of the Plan.

11.    Defendant Franklin Templeton is the Plan sponsor and a party in interest to the Plan under 29 U.S.C. §1002(14). In certain situations, Franklin Templeton also acts as the Plan Administrator. Franklin Templeton is a corporation organized under the laws of the state of Delaware, with its corporate headquarters and principal place of business in the city and county of San Mateo, California.

12.    Upon information and belief, Franklin Templeton, acting through its officers, directors, employees, or agents was a fiduciary to the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or responsibility respecting the administration of the Plan.

13.    Franklin Resources, Inc., acting by and/or through its Board of Directors (the "Board of Directors"), is a fiduciary within the meaning of ERISA, and thus subject to the fiduciary standard of care, because it appoints and removes the members of the Investment Committee, as well as designating the Plan Administrator, the named fiduciary for the Plan. The Board is also responsible for monitoring Investment Committee's exercise of its discretionary authority over the Plan.

14.    During the relevant period, the Board of Directors consists or has consisted of Defendants Gregory E. Johnson, Rupert H. Johnson, Jr., Charles B. Johnson, Charles E. Johnson, Peter K. Barker, Mariann Byerwalter, Mark C. Pigott, Chutta Ratnathicam, Laura Stein, Seth Waugh, Geoffrey Y. Yang, Samuel Armacost, Joseph Hardiman, Anne Tatlock, and John Doe Defendants 1–10.

15.     The Board of Directors may remove any member of the Committee at any time with or without advance notice. Vacancies on the Committee are filled by the Board of Directors.

16.     Upon information and belief, Franklin Templeton has exercised control over the activities of its employees, internal departments and subsidiaries that performed fiduciary functions with respect to the Plan, and can hire or appoint, terminate, and replace such employees at will. Franklin Templeton is therefore liable for the fiduciary breaches alleged herein of its employees, internal departments and subsidiaries.

17.     Franklin Templeton cannot act on its own. In this regard, on information and belief, Franklin Templeton relied directly on the other Defendants to carry out its fiduciary responsibilities under the Plan and ERISA and the acts of its officers and employees alleged herein are the acts of Franklin Templeton.

### III.   THE PLAN

18.     The Plan is sponsored by Franklin Resources, Inc. It was established on October 1, 1981 and amended on October 1, 2010.

19.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. §1002(2).

20.     The Plan is an "individual account plan" or "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

21.     The Plan purports to be a "401(k) Plan" under 26 U.S.C. §401.

22.     The Plan covers substantially all employees of Franklin Templeton and its U.S. subsidiaries who meet certain employment requirements.

### IV.   THE PLAN'S INVESTMENTS

23.     Defendants' fiduciary duties are among the "highest [duties] known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982). Consistent with these fiduciary duties, Defendants had a fiduciary duty to Plaintiff, the Plan, and the

other participants in the Plan to offer only prudent investment options. A fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l.*, 135 S.Ct. 1823, 1829 (2015). Defendants therefore breached their fiduciary duty of prudence under ERISA §404(a)(1)(B); 29 U.S.C. §1104(a)(1)(B).

### A.   The Proprietary Mutual Funds

24.   There is no shortage of reasonably priced and well-managed investment options in the 401(k) plan marketplace.

25.   Despite the many investment options available in the market, the Plan has invested hundreds of millions of dollars in mutual funds managed by Franklin Templeton and its subsidiaries. These investment options were chosen because they were managed by, paid fees to, and generated profits for Franklin Templeton and its subsidiaries.

26.   Over the relevant time period, over forty mutual funds offered by the Plan were, and continue to be, managed by Franklin Templeton or its subsidiaries (the "Proprietary Funds"). The Plan also includes a Company Stock Fund, which invests in common stock of Franklin Templeton, and a collective trust, managed by State Street Global Advisors, which is intended to track domestic large-capitalization stocks as represented in the S&P 500 Index. In 2015, the Plan also added three other collective trusts, also managed by State Street Global Advisors, to offer index tracking for international stocks, domestic small and mid-capitalization stocks, and bonds. Prior to 2015, the S&P 500 Index Fund was the only passively managed, and only non-proprietary, option in the Plan.

27.   The Plan's investments were chosen and retained by or at the direction of the Investment Committee.

28.     The Plan's investment in the Proprietary Funds averaged over $750 million per year from 2011 to the present.

29.     The Proprietary Funds generated millions of dollars in fees for Franklin Templeton and its subsidiaries.

30.     At all times relevant herein, the Proprietary Funds charged and continue to charge Plan participants and beneficiaries fees that were and are unreasonable for this Plan. The fees charged were and are significantly higher than the median fees for comparable mutual funds in 401(k) plans as reported by the Investment Company Institutes, in The Economics of Providing 401(k) Plans: Services, Fees and Expenses and by BrightScope, Inc. an independent provider of 401(k) ratings and data, based on its review of 1,667 large 401(k) plans reported in Real Facts about Target Date Funds.

31.     The fees, moreover, are and were significantly higher than the fees available from alternative mutual funds, including Vanguard Institutional Funds, with similar investment styles that were readily available as Plan investment options throughout the relevant time. The percentage of excess compared to the fees charged by comparable Vanguard Institutional Funds is shown in Column D below. That difference was even larger at the time most of these investments were selected, as current — and cheaper — R6 share classes of the Proprietary Funds were not offered in the Plan prior to 2014. Fees are measured in basis points ("bps") where one basis point equals 0.01%:

| Fund | R6 Fee | Vanguard Fund | Vanguard Fee | Excess over Vanguard |
|------|--------|---------------|--------------|----------------------|
| Money Fund | 47 bps | VMRXX | 10 bps | 370% |
| Balance Sheet Inv. Fund | 50 bps | VMVAX | 8 bps | 525% |

| Flex Cap Growth Fund | 48 bps | VIGIX | 7 bps | 586% |
|---|---|---|---|---|
| Growth Fund | 46 bps | VIGIX | 7 bps | 557% |
| Growth Opportunities Fund | 68 bps | VIGIX | 7 bps | 871% |
| High Income Fund | 47 bps | VWEAX | 13 bps | 261% |
| Income Fund | 38 bps | VTWIX | 13 bps | 192% |
| International Growth Fund | 102 bps | VWILX | 34 bps | 200% |
| Large Cap Value Fund | 84 bps | VIVIX | 7 bps | 1,100% |
| LifeSmart Income Fund | 68 bps | VTINX | 14 bps | 386% |
| LifeSmart 2020 Fund | 72 bps | VTWNX | 14 bps | 413% |
| LifeSmart 2025 Fund | 73 bps | VTTVX | 15 bps | 387% |
| LifeSmart 2030 Fund | 75 bps | VTHRX | 15 bps | 400% |
| LifeSmart 2035 Fund | 74 bps | VTTHX | 15 bps | 393% |
| LifeSmart 2040 Fund | 76 bps | VFORX | 16 bps | 375% |
| LifeSmart 2045 Fund | 75 bps | VTIVX | 16 bps | 369% |
| LifeSmart 2050 Fund | 75 bps | VFIFX | 16 bps | 369% |
| Low Duration Total Return | 42 bps | VSTBX | 7 bps | 500% |
| MicroCap Value Fund | 80 bps | VSIIX | 7 bps | 1,043% |
| Mutual Beacon Fund | 70 bps | VIVIX | 7 bps | 900% |
| Mutual European | 89 bps | VESIX | 9 bps | 889% |
| Mutual Global Discovery | 82 bps | VFWSX | 11 bps | 645% |
| Real Return Fund | 50 bps | VIPIX | 7 bps | 614% |
| Rising Dividend Fund | 52 bps | VDADX | 9 bps | 478% |

| Small Cap Growth Fund | 72 bps | VSGIX | 7 bps | 929% |
| Small Cap Value Fund | 61 bps | VSIIX | 7 bps | 771% |
| Small-Mid Cap Growth | 48 bps | VIEIX | 7 bps | 586% |
| Strategic Income | 47 bps | VCOBX | 15 bps | 213% |
| Conservative Allocation | 92 bps | VASIX | 12 bps | 667% |
| Growth Allocation | 82 bps | VASGX | 15 bps | 447% |
| Moderate Allocation | 94 bps | VSMGX | 14 bps | 571% |
| Total Return Fund | 46 bps | VBIMX | 6 bps | 667% |
| U.S. Gov. Securities Fund | 47 bps | VFIUX | 10 bps | 370% |
| Templeton Developing Mkts | 122 bps | VEMIX | 12 bps | 917% |
| Templeton Foreign Fund | 72 bps | VTRIX | 46 bps | 57% |
| Templeton Frontier Markets | 165 bps | VEMIX | 12 bps | 1,275% |
| Templeton Global Bond Fund | 50 bps | VTIFX | 9 bps | 456% |
| Templeton Global Smaller Co | 94 bps | VTWIX | 13 bps | 623% |
| Templeton Growth Fund | 70 bps | VTWIX | 13 bps | 438% |
| Templeton World Fund | 72 bps | VTWIX | 13 bps | 454% |

32.    Prior to July 1, 2014, the Plan invested in the Advisor share class of each Proprietary Fund.

33.     During the period the Plan invested in the Advisor share class of the Proprietary Funds, the Proprietary Funds' Transfer Agent, Franklin Templeton Investor Services, LLC, paid Charles Schwab, the Plan's Recordkeeper and Trustee, $1 per plan participant account per month. Franklin Templeton Investor Services, LLC collected those fees from the Franklin mutual funds, reducing the value of the mutual funds for all shareholders. In 2013, those Plan-related payments totaled approximately $400,000.

34.     Plaintiff was, until 2017, not aware of these existence, let alone the extent, of these payments.

35.     The Plan was, at that time, liable to Schwab for $70 per participant per year in administrative fees. If the payments to Charles Schwab from the Plan's mutual funds were less than the $70 per participant per year rate, the Plan was liable to Charles Schwab for the difference.

36.     Likewise, if the payments to Charles Schwab from the Plan's mutual funds exceeded the $70 per participant per year rate, the overage would be used to pay other plan expenses.

37.     During the Class Period, because Franklin offered the Plan lower shareholder service fees, the Plan both had to pay additional administrative fees to the Plan's recordkeeper and lost the opportunity to benefit from the reimbursement of fees to the Plan for other purposes.

38.     At the same time, for other shareholders of the same Advisor share class of the Proprietary Funds, Franklin offers a 15 bp beneficial owner servicing credit, which was also paid by Franklin Templeton Investors Services, LLC using fees collected from the Franklin mutual funds and reducing the value of the mutual funds for all shareholders, including the Plan. The 15 bp beneficial owner servicing credit was offered to Franklin-fund shareholders such as the Mercury General Corporation Profit Sharing Plan, but was not available to the Plan.

39.     Upon information and belief, other shareholders in the Advisor share class benefitted from the additional 15 bps through payments to their advisors, including Franklin Templeton Institutional, LLC, the funds' distributor, Franklin Templeton Distributors, Inc., or entities who had entered into selling agreements with Franklin Templeton Distributors, Inc.

40.     Had Franklin made 15 bps available for the benefit of the Plan, as it did with other shareholders, the Plan and Charles Schwab would have received beneficial owners servicing credits of approximately $1.1 million per year, an increase of $700,000 per year from the benefit offered by Franklin for its own Plan.

41.     Conversely, had Franklin offered all shareholder the same arrangement as it had with Charles Schwab for the Plan, the amount of the payments made from each fund would have been less, causing the value of the Plan's investments in the Franklin Funds to be higher.

42.     Plaintiff did not know of the Plan fee offsets, the beneficial owner servicing credits, the $1 per plan participant account per month arrangement between Franklin and Schwab, or the 15 bps payments to other Plans until after the institution of this Action.

43.     Additionally, each Proprietary Fund charges fees in excess of the fees the Plan would have paid by purchasing comparable institutional products such as separately managed accounts. As the Department of Labor reports, for plans like Franklin Templeton's Plan, the "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Study of 401(k) Plan Fees and Expenses*, April 13, 1998.

44.     Franklin offers and sells investment products similar or identical to those in the Plan to institutional clients through separately=managed accounts and sub-advised portfolios.

45.     For example, the Plan invested over $30 million in the Templeton Global Bond Fund, which charged a fee of over 50 basis points. However, Defendants offered a Templeton Global Bond Fund separately managed account to institutional investors with at least $500,000, for negotiated fees which, upon information and belief, were often less than the fees charged to investors in the Templeton Global Bond Fund mutual fund.

46.     With an operating margin of over 37%, very high for the mutual fund industry, Defendants made a fortune off of the Plan's investments in Proprietary Funds.

47.     Many of the Proprietary Funds had and continue to have poor performance histories compared to prudent alternatives Defendants could have chosen for inclusion in the Plan.

48.     For example, from the beginning of the relevant time period until at least September, 2013, the Plan included three Asset Allocation Funds, the Conservative Allocation Fund, Moderate Allocation Fund, and Growth Allocation Fund, which were all Proprietary Funds managed by T. Anthony Coffey and Thomas A. Nelson of Franklin Templeton.

49.     The Asset Allocation Funds had been performing poorly. All three trailed their Morningstar peer median returns in 2011 and 2012, with only the Conservative Allocation Fund beating its peers in 2013 — after finishing in the 90th and 76th percentiles the prior two years.

50.     In July, 2013, Franklin Templeton created a series of target date funds. Both asset allocation funds and target date funds are similar in that both invest their assets in a collection of mutual funds which in turn invest in foreign and domestic stocks and bonds, providing asset allocation within a single fund. Mssers. Coffey and Nelson, the unsuccessful managers of the Allocation Funds, were also the managers of these new, untested funds.

51.     Defendants decided to replace the Allocation Funds with Target Date Funds shortly before or during 2014. At the time, there was no shortage of established, cheaper target date fund families in the marketplace. Instead of selecting one of these cheaper, better funds, Defendants chose for the Plan the untested, expensive Proprietary Target Date Funds, despite the poor performance of its managers managing similar Asset Allocation Funds. A prudent, un-conflicted fiduciary would not have chosen untested, more expensive funds, particularly in light of the individual manager's inability to succeed managing similar funds in the recent past.

52.     The Target Date Funds have subsequently underperformed the cheaper, established, prudent alternative funds which, upon information and belief, were not even considered by Defendants when they decided to invest Plan assets in the Target Date Funds. The most conservative Target Date Fund, the Retirement Income Fund, has performed worse than two-thirds of its Morningstar peers each and every year of its existence. The most aggressive, the 2055 Fund, underperformed 97% of its peers in 2016, the only full year of its existence, and continues to underperform its Morningstar peer category thus far in 2017. Except for the Retirement Income Fund, which finished in the bottom third, all of the proprietary Target Date Funds in the Plan finished 2016 in the bottom 10 percent of their peer groups Since their inception in July, 2013, the Target Date Funds have underperformed their Vanguard peers by over $3 million.

53.     The Target Date Funds' underperformance is not unique. In 2015, only 24% of Franklin Templeton mutual funds outperformed their peer median.

54.     Many of the Proprietary Funds were and are poorly rated by Morningstar, the independent rating service, compared to prudent alternatives the Committee could have chosen for inclusion in the Plan. For example, not a single Proprietary Fund is rated 5-stars (out of 5), the highest rating, by Morningstar. To the

contrary, the Templeton World Fund and Templeton Frontier Markets Fund, are rated 1-star, the lowest rating. Other Proprietary Funds have 2-star ratings and most of the rest have mediocre 3-star ratings.

55.    Prudent investors fled Franklin Templeton's mutual funds, including the Proprietary Funds. In the fiscal year ending September 30, 2015, investors on net withdrew $59.2 billion from Franklin Templeton funds. The following quarter, they withdrew an additional $20.6 billion. In 2016, investors withdrew another $42.5 billion. In 2017, the outflows have continued, with investors withdrawing an additional $18.3 billion during the first half of the year.

56.    Despite the poor performance, high fees, and low Morningstar ratings, the only Proprietary Funds removed from the Plan during the entire Class Period were replaced with other Proprietary Funds. For example, the three Asset Allocation Funds were replaced, as discussed above, with eight proprietary Target Date Funds using the same failed managers as the Asset Allocation Funds. In addition, in 2016 five Proprietary Funds were removed and their assets transferred to other Franklin Funds, with the result being over $100,000 per year in *additional fees* to Franklin at the expense of the Plan and its participants.

| Removed Fund | Removed Fund Fee | Replacement Fund | Replacement Fund Fee | Assets in Removed Fund | Additional Fees to Franklin |
|---|---|---|---|---|---|
| US Gov. Securities Fund | 47 bps | Total Return Fund | 46 bps | $18,777,486 | -$1,878 |
| Balanced Sheet Fund | 50 bps | Rising Dividend Fund | 52 bps | $6,805,384 | $1,361 |
| Flex Cap Growth Fund | 46 bps | Growth Opportunities Fund | 68 bps | $13,992,198 | $30,783 |

| Small Mid Cap Growth Fund | 48 bps | Small Cap Growth | 66 bps | $38,729,155 | $69,712 |
| High Income Fund | 47 bps | Strategic Income Fund | 48 bps | $9,586,381 | $959 |

57.    Meanwhile, four Proprietary Funds, as well as the Target Date Funds, were added to the Plan during the Class Period. They are the International Growth Fund, for which Franklin Templeton charges 102 bps, the Templeton Frontier Markets Fund, for which Franklin Templeton charges 165 bps, and the Real Return Fund, for which Franklin Templeton charges 50 bps, and the Templeton Foreign Equity Fund, for which Franklin Templeton charges 72 bps.

58.    The Plan lost in excess of $60 million during the class period as a result of losses sustained by the Proprietary Funds compared to prudent alternatives such as comparable Vanguard Funds.

**B.    The Franklin Money Market Fund**

59.    Stable value funds and money market funds are two investment vehicles designed to preserve principal while providing a return.

60.    Stable value funds are a common investment in defined contribution plans and in fact are designed specifically for use in large defined contribution plans.

61.    The structure of stable value funds allows them to outperform money market funds in virtually all market conditions and over any appreciable time period. See, *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006).

62.    Stable Value Funds hold longer duration instruments generating excess returns over money market investments. Stable value funds also provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection is provided through a wrap

16

contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

63.    Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[1]

64.    Because they offer higher returns than money market funds, greater consistency of returns, and less risk to principal, large defined contribution plans commonly offer stable value funds to participants.

65.    A 2011 study from Wharton Business School analyzed money market and stable value fund returns from the previous two decades and concluded that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011).[2]

66.    According to the 2015 Stable Value Study published by MetLife, over 80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors* at 5 (2015).[3] The study also notes that stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable

---

[1] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.
[2] Available at http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf (last accessed June 24, 2016).
[3] Available at https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money-Market/2015_StableValueStudyWebFinal.pdf.

value returns have outperformed money market returns over the last 25 years." *Id.* at 7 (emphasis added).

67.    Unlike the majority of defined contribution plans, the Plan has not offered a stable value fund. Instead, the Plan offered the Franklin Funds Money Market Fund, a fund managed by Franklin and paying Franklin up to 47 bps per year, while paying nothing at all to the Plan and its participants.

68.    In real terms, investors in this most-conservative option have lost over 12% of their buying power over the Class Period. Had Defendants used a comparable stable value fund, the plan participants would have seen their assets grow by over 22% during that period. These losses could also have been mitigated had Defendants considered any of the numerous superior non-proprietary money market funds available in the marketplace throughout the class period.

69.    Had these assets been invested in a stable value fund instead, they would have had inflation-beating returns. For example, one alternative, the Vanguard Stable Value Fund has enjoyed the following returns:

| Fund | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|------|------|------|------|
| **Stable Value** | 3.66% | 4.06% | 3.56% | 2.68% | 2.06% | 2.00% | 2.21% | 2.22% |
| **Inflation** | 2.63% | 1.63% | 2.93% | 1.59% | 1.58% | -0.09% | 1.37% | 2.07% |
| **Plan Money Market** | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

70.    Franklin does not manage any stable value funds.

71.    In addition to the breaches of loyalty resulting from the selection and maintenance of the Money Market Fund, by including and failing to remove the Money Market Fund, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then

18

prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

72.     The Plan lost in excess of $9 million during the class period as a result of losses sustained by the Money Market Fund compared to Stable Value alternatives.

### C.     Excessive Total Plan Cost

73.     In addition to paying the bloated expense ratios charged by Franklin Templeton on the Proprietary Funds, the Plan pays a separate administrative fee, charged to each participant at a rate of $12.00 per quarter, or $48 per year. Additional charges are also incurred for services provided to the Plan by other vendors.

74.     The Plans' Form 5500 filings with the U.S. Department of Labor contain an Independent Auditor's Report, which state that on September 30, 2014 the Plan's assets were $1,178,463,741 and on September 30, 2015, the Plan's assets were $1,095,737,878. The Plan has remained above $1 billion in assets ever since.

75.     In total, the Plan paid $6.5 million per year in investment management and administrative fees. Given the Plan size, the average Total Plan Cost was over 57 bps in 2014 and 2015.

76.     A recently published report shows that in 2013, the average 401(k) defined contribution plan with more than a billion dollars in assets bore a total plan cost as a percentage of assets of 31 basis points. See BrightScope and Investment Company Institute, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 47 (Dec. 2015), available at: https://www.ici.org/pdf/ppr_15_dcplan_profile_401k.pdf. In 2014, that dropped to 30 basis points. See BrightScope and Investment Company Institute, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 49 (Dec. 2016), available at: https://www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf.

77.     Thus, the total plan cost, including investment and administrative fees, was nearly double the cost of comparable plans that are not subject to conflicted

fiduciary decision-making. This difference is almost entirely the result of the mutual fund fees paid to Franklin Templeton.

78.     In the six-year period 2011–2016, the Plan paid approximately $15 million more at the 57 basis points fee rate than did a plan at the 31 (or 30) basis points fee rate.

79.     These facts support an inference that Defendants allowed Franklin Templeton to receive excessive compensation by larding the Plan with excessively expensive Proprietary Funds.

### D.     Total Recordkeeping Fees Were Excessive

80.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

81.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals, every 3–5 years.

82.     Upon information and belief, Defendants failed to competitively bid the Plan's recordkeeping services between 2005 and 2013.

83.     The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. The cost of providing recordkeeping services is the same regardless of account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping

compensation increases without any change in the recordkeeping and administrative services.

84.    Large defined contribution plans, like the Plan,[1] experience economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per participant fee charged for recordkeeping and administrative services decline. These lower administrative expenses are readily available for plans with a greater number of participants.

85.    The Plan initially contracted with the 401k Company (subsequently purchased by Schwab) to use their recordkeeping services. Franklin Templeton paid $70 per person to Schwab under the Plan.

86.    After 2013, the Investment Committee and Administrative Committee selected Bank of America Merrill Lynch ("BAML") as the Plan recordkeeper. Those fees were $48 per person.

87.    BAML is a corporate partner of Franklin Templeton. BAML recordkeeps and administers other benefit plans for Franklin Templeton.  Franklin Templeton markets its mutual funds to BAML advisors and shares revenue with BAML based on BAML's ability to sell Franklin Templeton funds. Franklin Templeton sponsors BAML conferences[4], and BAML serves as financial advisors to Franklin Templeton subsidiaries.[5]

88.    Market prices for mega-plans, like the Plan, are typically considerably lower because of available economies of scale and the bargaining power exerted by prudent fiduciaries. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (recordkeeping fees were $32 per participant in 2012); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees were $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (reversing

---

[1] http://www.plansponsor.com/2015-Recordkeeping-Survey/
[4] https://www.franklintempleton.com/en-us-retail/investor/approach/firm/press-article.page?DocID=jbnanpqb
[5] https://www.franklintempleton.com/en-us-retail/investor/approach/firm/press-article.page?DocID=jbnanpqb

grant of summary judgment where plaintiffs' expert opined market rate of $20–$27 and plan paid recordkeeper $43–$65 per participant for a smaller plan than the Plan); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the plan to pay not more than $35 per participant for recordkeeping, also involving a smaller 401(k) plans).

89.    Recordkeeping fees of $48 per person was excessive and unreasonable for the Plan and participants. The recordkeeping fees for a plan the size of the Plan should have been below $35 per participant.

90.    Many of the market leaders in mega-plan recordkeeping are — unlike BAML — competitors of Franklin Templeton's mutual fund business, including Fidelity, TIAA, Vanguard and JP Morgan (whose recordkeeping business was subsequently sold to Mass Mutual).

91.    Upon information and belief, the Investment Committee and Administrative Committee excluded these asset managers from recordkeeping the Plan, preventing the Plan from securing recordkeeping fees at market rates.

92.    As a result of the forgoing, the Plan and its participants paid hundreds of thousands of dollars per year in excessive recordkeeping fees.

**E.    Individual Defendants' Conflicts of Interest**

93.    The Individual Defendants suffered from direct, personal, and pecuniary conflicts when serving as fiduciaries for the Plan.

94.    Director Defendants and brothers Charles B. Johnson and Rupert H. Johnson, Jr. each own and owned over 100 million shares of Franklin Resources, Inc., holdings which were, for much of the class period, valued at over $3 billion and 15% of the company, each.

95.    Charles B. Johnson and Rupert H. Johnson, Jr. are the sons of Rupert H. Johnson, Sr., who founded Franklin Resources in 1947.

96.    Director Defendants and brothers Charles E. Johnson and Gregory E. Johnson each own over 5 million shares of Franklin Resources, Inc., holdings which were, for much of the class period, valued at over $150 million each. Charles E. Johnson and Gregory E. Johnson are the sons of Charles B. Johnson.

97.    Investment Committee member, and sister of Gregory E. Johnson, Jennifer M. Johnson, owns over 4 million shares of Franklin Resources, Inc., holdings which were, for much of the class period, valued at over $130 million each. Ms. Johnson is the President and Chief Operating Officer of Franklin Resources, Inc. She is also responsible for Franklin Templeton's global retail and institutional distribution efforts, including product development.

98.    In addition, the Committee included Ken Lewis, Franklin's Chief Financial Officer, Dan Carr, Franklin's Secretary and General Counsel, and Rick Frisbie, Franklin's former Chief Administrative Officer and Executive VP responsible for overseeing the asset allocation and target date funds.

99.    These individuals personally benefited from the Plan's investments in Franklin Funds.

**V.    ERISA'S FIDUCIARY STANDARDS**

100.   ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants  as fiduciaries of the Plan. ERISA § 404(a), 29 U.S.C.§ 1104(a), provides, in relevant part, as follows:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest  of the participants and beneficiaries and —

(A)    for the exclusive purpose of:

(i)    providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;
[and]

1      (B)     with the care, skill, prudence, and diligence under the

2   circumstances then prevailing that a prudent man acting in a like capacity and

3   familiar with such matters would use in the conduct of an enterprise of like

4   character and with like aims;

5      (C)     by diversifying the investments of the plan so as to minimize the

6   risk of large losses, unless under the circumstances it is clearly prudent not to

7   do so[.]

8      101.   Under ERISA, fiduciaries who exercise discretionary authority or control

9   over the  selection of plan investments and the selection of plan service providers

10  must act prudently and  solely in the interest of participants and beneficiaries of the

11  plan when performing such  functions. Thus, "the duty to conduct an independent

12  investigation into the merits of a particular  investment" is "the most basic of

13  ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420,

14  435 (3d Cir. 1996).

15     102.   As the Department of Labor explains,

16         [T]o act prudently, a plan fiduciary must consider,

17         among other factors, the  availability, riskiness, and

18         potential return of alternative investments for his or her

19         plan. [Where an investment], if implemented, causes

20         the Plan to forego other  investment opportunities, such

21         investments would not be prudent if they provided  a

22         plan with less return, in comparison to risk, than

23         comparable investments  available to the plan, or if

24         they involved a greater risk to the security of plan

25         assets than other investments offering a similar return.

26

27         DOL Opinion 88-16A (1988).

28

1

2          103.   Pursuant to these duties, fiduciaries must ensure that the services

3    provided to the  plan are necessary and that the fees are reasonable:

4                        Under section 404(a)(1) of ERISA, the responsible

5                        Plan fiduciaries must act  prudently and solely in the

6                        interest of the Plan participants and beneficiaries … in

7                        determining which investment options to utilize or

8                        make available to Plan  participants or beneficiaries. In

9                        this regard, the responsible Plan fiduciaries must

10                       assure that the compensation paid directly or indirectly

11                       by the Plan to [service  providers] is reasonable . . .

12

13         DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

14

15         104.   A fiduciary's duty of loyalty requires a fiduciary to act solely in the

16   interest of  plan participants and beneficiaries. As the Department of Labor has

17   warned:

18                        [T]he Department has construed the requirements that

19                        a fiduciary act solely in the interest of, and for the

20                        exclusive purpose of providing benefits to participants

21                        and  beneficiaries, as prohibiting a fiduciary from

22                        subordinating the interests of  participants and

23                        beneficiaries in their retirement income to unrelated

24                        objectives.  In other words, in deciding whether and to

25                        what extent to invest in a particular  investment, or to

26                        make a particular fund available as a designated

27                        investment  alternative, a fiduciary must ordinarily

28

consider only factors relating to the interests of plan
participants and beneficiaries in their retirement
income. A decision to make an investment, or to
designate an investment alternative, may not be
influenced by non-economic factors unless the
investment ultimately chosen for the plan, when
judged solely on the basis of its economic value, would
be equal to or superior to alternative available
investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988). The
Department of Labor has repeatedly warned that:

While the law does not specify a permissible level of
fees, it does require that fees charged to a plan be
"reasonable." After careful evaluation during the initial
selection, the plan's fees and expenses should be
monitored to determine whether they continue to be
reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee
Benefits Security Admin. (Feb. 2012),
http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

105.  In a separate publication, the Department of Labor writes as follows:
The Federal law governing private-sector retirement
plans, the Employee Retirement Income Security Act

(ERISA), requires that those responsible for managing retirement plans -- referred to as fiduciaries -- carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.

* * *

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

* * *

> By far the largest component of plan fees and expenses
> is associated with managing plan investments. Fees for
> investment management and other related  services
> generally are assessed as a percentage of assets
> invested. Employers  should pay attention to these
> fees. They are paid in the form of an indirect charge
> against the participant's account or the plan because
> they are deducted directly  from investment returns.
> Net total return is the return after these fees have been
> deducted. For this reason, these fees, which are not
> specifically identified on  statements of investments,
> may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor Employee Benefits Security Admin. (Dec. 2011), http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

106.   ERISA § 409, 29 U.S.C. § 1109, provides, inter alia, that any person who is a  fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or  duties imposed on fiduciaries by Title I ERISA shall be personally liable to make good to the  plan any losses to the plan resulting from each such breach and to restore to the plan any profits  the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C. § 1109, further provides that such  fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## VI.   ERISA'S PROHIBITED TRANSACTION

107.   The general duties of loyalty and prudence imposed by 29 U.S.C. §1004 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered violations unless an exemption applies.

108.  Section 1106(a)(1) states, in pertinent part, that:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect —

(A)     sale or exchange, or leasing, of any property between the plan and a party in interest;

* * *

(C)     furnishing of goods, services, or facilities between the plan and a party in interest;

(D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

109.    Section 1106(b) provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not —

(1)     deal with the assets of the plan in his own interest or for his own account,

(2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

110.  Accordingly, Defendants, as plan fiduciaries, were and are prohibited from causing the plan to engage in transactions with Franklin, including causing the plan to invest assets in the investment management and other products offered by a

party in interest or plan fiduciary and the payment of investment management or other fees in connection with such investments, unless an express exemption is available.

111.  Prohibited Transaction Class Exemption 77-3 provides a limited exemption for a mutual fund company to include proprietary mutual funds like those in the Plan, however the exemption requires that the plan must not "have dealings with the fund on terms any less favorable to the plan than such dealings are to other shareholders." 42 Fed. Reg. at 18735.

112.  Because Franklin offered and made service fee credits to other shareholders, such as the Mercury General Corporation Profit Sharing Plan, far in excess of the credits offered actually paid to the Plan's recordkeeper for the benefit of the Plan, Franklin's dealings with the Plan were on terms less favorable to the Plan than its dealings with other shareholders, and PTE 77-3 does not apply.

113.  29 U.S.C. § 1132(a)(3) provides a cause of action against a party in interest, such as Franklin, for participating in the breach of a fiduciary.

114.  29 U.S.C. § 1105(a) provides a cause of action against a fiduciary, such as Defendants, for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach.

**VII.  CLASS ALLEGATIONS**

115.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant,  beneficiary, or the Secretary of Labor to bring a suit individually on behalf of the Plan to recover for the Plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

116.  In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of the following class:

1

*All participants in the Franklin Templeton 401(k) Retirement Plan from July*

2

*28, 2010 to the date of judgment. Excluded from the class are Defendants,*

3

*Defendants' beneficiaries, and Defendants' immediate families.*

4

117.   Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1),

5

(b)(2), and/or (b)(3).

6

(a)     The class satisfies the numerosity requirement of Rule 23(a) because it

7

is composed of over one thousand persons, in numerous locations. The number of

8

class members is so large that joinder of all its members is impracticable.

9

(b)     The class satisfies the commonality requirement of Rule 23(a) because

10

there are questions of law and fact common to the Class and these questions have

11

common answers. Common legal and factual questions include, but are not limited

12

to: who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29

13

U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties

14

to the Plan by causing the Plan to invest in excessively expensive funds and by

15

failing to prudently remove the funds from the Plan; whether the decision to include

16

and not to remove a fund was made solely in the interests of Plan participants and

17

beneficiaries; what are the losses to the Plan resulting from each breach of fiduciary

18

duty; and what are the profits of any breaching fiduciary that were made through the

19

use of Plan assets by the fiduciary.

20

(c)     The class satisfies the typicality requirement of Rule 23(a) because

21

Plaintiffs' claims are typical of the claims of the members of the Class because

22

Plaintiffs' claims, and the claims of all Class members, arise out of the same

23

conduct, policies and practices of Defendants as alleged herein, and all members of

24

the Class are similarly affected by Defendants' wrongful conduct. Plaintiff was and

25

remains an investor in the Plan for the entirety of the Class Period.

26

(d)     The class satisfies the adequacy requirement of Rule 23(a). Plaintiff

27

will fairly and adequately represent the Class and have retained counsel experienced

28

and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

(e)     Class action status in this action is warranted under Rule 23(b)(1)(A) because  prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would  substantially impair or impede their ability to protect their interests.

(f)     In the alternative, certification under Rule 23(b)(2) is warranted because  Defendants acted or refused to act on grounds generally applicable to the Class, thereby making  appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(g)     In the alternative, certification under Rule 23(b)(3) is appropriate because  questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

**VIII. CLAIMS FOR RELIEF**

**First Claim For Relief: Breach of Fiduciary Duty**

118.  Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

119.  The Committee and its members are responsible for selecting, monitoring, and removing investment options in the Plan.

120.   The Board of Directors and its members are responsible for appointing, monitoring, and removing members of the Committee.

121.   Defendants caused the Plan to invest nearly a billion of dollars in imprudent investment options, many of which were more expensive than prudent alternatives, unlikely to outperform their benchmarks, and laden with excessive fees which were paid to Franklin Templeton and its subsidiaries.

122.   Defendants failed to remove the funds even though a prudent fiduciary would have done so given the high fees, poor performance prospects, and availability of lower-cost alternatives.

123.   Defendants permitted Schwab, and later Bank of America Merrill Lynch, to receive excessive compensation for recordkeeping and administrative services to the Plan, instead of prudently including in their fiduciary decision-making process lower-cost market-priced vendors, such as JP Morgan, Fidelity and Vanguard.

124.   By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

125.   Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

126.   As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess investment management and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are

jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

**Second Claim For Relief: 29 U.S.C. § 1106(a) Prohibited Transactions**

127.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

128.   This Count alleges prohibited transactions against all Defendants

129.   Defendants caused the Plan to use Proprietary mutual funds as investment options when they knew or should have known those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

130.   As Plan Sponsor, Franklin and its subsidiaries were parties in interest.

131.   As a direct and proximate result of these prohibited transaction violations, the Plan, directly or indirectly, paid millions of dollars in investment management and other fees that were prohibited by ERISA and suffered millions of dollars in losses.

132.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by Franklin from the fees paid by the Plan to Franklin and its subsidiaries and affiliates as well as appropriate equitable relief.

**Third Claim For Relief: 29 U.S.C. § 1106(b) Prohibited Transactions**

133.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

134.   This Court alleges prohibited transactions against all Defendants.

135.  Defendants dealt with the assets of the plan in their own interest and for their own account when they caused the Plan to use Proprietary mutual funds as investment options.

136.  In causing the Plan to use Proprietary mutual funds, Defendants acted in a transaction involving the plan on behalf of Franklin, a party whose interests were adverse to the interests of the plan, its participants and beneficiaries.

137.  Further, Franklin received consideration for its own personal account from the Proprietary mutual funds in connection with their inclusion in the Plan.

138.  For the reasons stated above, Defendants are fiduciaries and parties in interest with respect to the Plan.

139.  Defendants knew of should have known that the transfer of Plan assets to the investment options selected and maintained in the Plan by Defendants allowed Franklin to benefit both financially, through fees paid by the options to Franklin, and commercially, by increasing the assets under management for the Franklin-managed investment options.

140.  As a direct result of these prohibited transactions, the Plan, directly or indirectly, paid millions of dollars in investment management and other fees that were prohibited by ERISA and suffered millions of dollars in losses.

141.  Pursuant to 29 U.S.C. §1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received by Franklin from the fees paid by the Plan to Franklin, as well as other appropriate equitable relief.

**Fourth Claim For Relief: Failure to Monitor Fiduciaries**

142.  Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

143.  This Count alleges breach of fiduciary duties against the Board of Directors and its members, and Franklin Resources, Inc. (collectively the "Monitoring Defendants").

144.  As alleged above, the Monitoring Defendants are fiduciaries pursuant to 29 U.S.C. § 1002(21). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

145.  As alleged above, the scope of the fiduciary responsibility of the Monitoring Defendants includes the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries.

146.  A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and plan participants when they are not.

147.  The Monitoring Fiduciaries breached their fiduciary monitoring duties by, among other things:

a.  Failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the Plan;

b.  Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the widespread use of proprietary funds from which Franklin — and by extension the Johnson family — received profits in violation of ERISA;

c.  Failing to ensure that the monitored fiduciaries appreciated the ready availability of comparable and better performing Plan fund options that charged significantly lower fees and expenses than the Plan's Franklin funds; and

d.     Failing to remove appointees whose performance was inadequate in that they continued to maintain the imprudent, and proprietary, options for participants' retirement savings in the Plan during the Class Period, and who breached their fiduciary duties under ERISA.

148.  As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered substantial losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and other Class members, lost tens of millions of dollars in retirement savings.

149.  Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     A declaration that the Defendants breached their fiduciary duties under ERISA § 404 and engaged in Prohibited Transactions in violation of ERISA §406;

B.     An order compelling the disgorgement of all fees paid and incurred, directly or indirectly, to Franklin Templeton and its subsidiaries by the Plan or by Proprietary Mutual Funds as a result of the Plan's investments in their funds, including disgorgement of profits thereon;

C.     An order compelling the Defendant to restore all losses to the Plan arising from Defendants' violations of ERISA, including lost-opportunity costs;

D.     An order granting appropriate equitable monetary relief against Defendants;

E.     An order granting such other equitable or remedial relief as may be appropriate, including the  permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's  investments in Proprietary Funds;

F.     An order certifying this action as a class action, designating the Class to receive  the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

G.     An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     An order awarding Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the Common Fund doctrine, along with pre- and post-judgment interest; and

I.     An order awarding such other and further relief as the Court deems equitable and just.


Dated: February 6, 2018            Respectfully submitted,

                                   /s/ Gregory Y. Porter
                                   Gregory Y. Porter, *pro hac vice*
                                   Mark G. Boyko, *pro hac vice*
                                   Bailey & Glasser LLP
                                   1054 31st Street, NW Suite230
                                   Washington, DC 20007
                                   Telephone: (202) 463-2101
                                   Facsimile: (202) 463-2103
                                   gporter@baileyglasser.com
                                   mboyko@baileyglasser.com

                                   /s/ Mark P. Kindall
                                   Mark P. Kindall, Cal. Bar No. 138703
                                   Robert A. Izard, *pro hac vice* to be filed
                                   IZARD KINDALL & RAABE LLP
                                   29 South Main Street, Suite 305
                                   West Hartford, CT 06107

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (860) 493-6292
Facsimile: (860) 493-6290
rizard@ikrlaw.com
mkindall@ikrlaw.com


/s/ Joseph A. Creitz
Joseph A. Creitz, Cal. Bar No. 169552
Lisa S. Serebin, Cal Bar No. 146312
CREITZ & SEREBIN LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 466-3090
Facsimile: (415) 513-4475
joe@creitzserebin.com
lisa@creitzserebin.com

*Attorneys for Plaintiffs*


**ATTESTATION**


Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the other signatories.


Dated: February 6, 2018          /s/ Gregory Y. Porter
                                 Gregory Y. Porter

39

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 6th day of February 2018, a true and correct copy of the foregoing was filed with the Court using the CM/ECF system and service upon all participants in this case who are CM/ECF users will be accomplished by operation of that system.

/s/ Gregory Y. Porter
Gregory Y. Porter, *pro hac vice*